IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:20-CV-00349-D

| | |
|---|---|
| GOLDEN CORRAL CORP. and GOLDEN CORRAL FRANCHISING SYSTEMS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> ILLINOIS UNION INSURANCE COMPANY, <br><br> Defendant. | **AMENDED COMPLAINT** |

NOW COMES Plaintiff Golden Corral Corporation and Plaintiff Golden Corral Franchising Systems, Inc. (collectively "Plaintiffs"), and complaining of Defendant Illinois Union Insurance Company ("Defendant"), alleges and says as follows:

## INTRODUCTION

1. This is a civil action by Plaintiffs seeking coverage under their business interruption insurance policy and related damages arising from the recent COVID-19 outbreak and its detrimental effects on Plaintiffs' business. Plaintiffs timely submitted claims for business interruption related to COVID-19 and seeking to recover damages under their insurance policy issued by Defendant. Though the insurance policy provides coverage for Plaintiffs' claims, Defendant has wrongfully denied coverage, violating its policy obligations, legal duties, and applicable law.

1

## PARTIES

2. Plaintiff Golden Corral Corporation ("Golden Corral") is a North Carolina corporation with its principal office located in Raleigh, Wake County, North Carolina.

3. Plaintiff Golden Corral Franchising Systems, Inc. ("GCFS") is a Delaware corporation doing business in North Carolina as Golden Corral Franchising Systems, Inc., with its principal office located in Raleigh, Wake County, North Carolina.

4. Defendant Illinois Union Insurance Company ("Illinois Union" or "Defendant") is an Illinois corporation with its principal office located in Philadelphia, Pennsylvania, upon information and belief. Defendant markets itself under the "CHUBB Group of Insurance Companies."

5. Upon information and belief, throughout the period relevant to this action, Illinois Union is or has been licensed under Chapter 58 of the North Carolina General Statutes and is authorized to conduct business in North Carolina; is or has been engaged in the business of insuring risks located in North Carolina, pursuant to N.C. Gen. Stat. § 58-21-1 *et seq.*; and is or has been transacting such business on a surplus lines or non-admitted basis.

6. Defendant Illinois Union has been served with legal process by service upon its registered agent in North Carolina, upon its agent expressly designated in the insurance policy, and/or upon the North Carolina Insurance Commissioner pursuant to N.C. Gen. Stat. §§ 58-16-30 & 58-21-100.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over the subject matter of this action pursuant to, *inter alia*, N.C. Gen. Stat. § 1-253.

8. This Court has personal jurisdiction over Defendant because, within the time period relevant herein, Defendant has been licensed to transact insurance business in North Carolina, has in fact transacted business in North Carolina, or has maintained a substantial presence in North Carolina, upon information and belief.

9. Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred and/or a substantial part of property that is the subject of the action is situated in this judicial district as set forth herein, and Plaintiffs' principal places of business are located in Raleigh, Wake County, North Carolina.

10. All conditions precedent as to Plaintiffs set forth in the applicable insurance contract have been performed.

## FACTUAL BACKGROUND

11. Founded in 1973 and based in Raleigh, North Carolina, Golden Corral is the nation's largest grill-buffet restaurant chain with restaurants operating in forty states. Golden Corral strives to make pleasurable dining affordable for families across America. Some of the restaurants are corporate-owned by Golden Corral, and others are franchise locations.

12. Golden Corral has granted GCFS the non-exclusive right to franchise others to operate restaurants using systems developed and owned by Golden Corral. The

franchisees pay certain royalties based on a percentage of their gross revenues to GCFS, which are in turn paid to Golden Corral.

13. There are approximately four hundred and eighty three (483) Golden Corral restaurant locations throughout the United States; thirty five (35) of the locations are corporate-owned by Golden Corral and four hundred and forty eight (448) are franchise locations.

14. Approximately sixty one (61) of the franchise restaurant locations are structured under leases with Golden Corral.

15. Approximately fifteen (15) of the franchisees also financed the purchase of certain equipment from Golden Corral.

**The Policy**

16. On or about March 31, 2019, Defendant issued Golden Corral a commercial insurance policy, number D4226555A 001 (the "Policy"), for the period of March 31, 2019 to March 31, 2020, which was applied for, signed, and delivered in North Carolina. The Policy is marketed under "Westchester," "A Chubb Company."

17. The Policy insures "all real and personal property of every kind and description" at an insured location or within 1000 feet thereof, and the Policy provides coverage for business interruption and for the losses to gross revenues, royalties, rental income, and extra expenses related thereto.

18. The Policy provides a maximum Limit of Liability of Fifty Million Dollars and 00/100 ($50,000,000.00), and states that, should an occurrence commence prior to the expiration of the Policy and extend beyond the expiration date of the Policy, the Policy will

pay for the losses occurring during such period as if they fell entirely within the term of the Policy.

19. The Policy is an "all-risks" policy, insofar as it provides that a peril insured under the Policy means loss or damage not otherwise excluded.

20. The Policy includes an Endorsement for "Interruption by Civil or Military Authority," which covers the actual loss of business income sustained when, as a result of "direct physical loss, damage or destruction **or imminent loss**" (emphasis added) within five miles of an insured location, the insured's business operations are "interrupted or reduced" because "access" is "impaired by order of civil or military authority."

21. The Endorsement also includes "Loss of Ingress or Egress," which covers the actual loss of business income sustained when, as a result of "direct physical loss, damage, or destruction by a peril insured" within five miles of an insured location, business operations are "interrupted or reduced" because "ingress to or egress from" that location is "impaired."

22. The Policy also includes a section for "Business Interruption," which covers the actual loss of business income resulting from the reduction of business operations caused by physical loss, damage, or destruction by a peril insured by the Policy of property insured.

23. The Policy defines the actual loss sustained by the insured as the reduction in gross earnings less charges and expenses that do not necessarily continue during the interruption or reduction of the business operations.

5

Case 5:20-cv-00349-D   Document 15   Filed 08/28/20   Page 5 of 17

24. "Royalties" are included for business interruption and described in part as "revenue under royalty, licensing fees or commission agreements between the Insured and another party."

25. Lost rent is included for business interruption and is described in part under "Rental Value," which covers the loss sustained by the insured resulting from untenantability caused by physical loss, damage, or destruction of property insured.

26. "Extra Expense" is also included for business interruption, which includes costs to "continue as nearly normal as practicable the conduct of the Insured's business" during the interruption.

27. "Claims Preparation Expenses" are also included for business interruption, which includes the "[e]xpenses incurred by the Insured or by the Insured's representatives including Accountants, Appraisers, Auditors, Consultants, Engineers, or other such professionals in order to arrive at the loss payable under this Policy in the event of a claim."

**COVID-19 Outbreak**

28. On or about January 21, 2020, the United States experienced its first reported case of the virus COVID-19, upon information and belief. Since then the virus has now reached the level of a global pandemic.

29. The Centers for Disease Control and Prevention ("CDC") and studies have concluded that COVID-19 survives and remains infectious on surfaces and objects for days. Thus a person can get COVID-19 by touching a surface or object that has the virus on it and, as such, COVID-19 physically affects and damages all with which it comes in contact.

30. COVID-19 has quickly spread around the country, including areas located within five miles of Golden Corral's corporate and franchise locations.

31. The CDC tracks and provides data on the progression and instances of COVID-19 across the country, including the counties in North Carolina, which is compiled on its website database as "Coronavirus Disease 2019 (COVID-19)," "Cases and Deaths by County."

32. Various civil authorities have recognized the presence and loss or damage to property and people by COVID-19 and the life-threatening dangers its has caused and have issued orders impairing (and even eliminating) access to restaurants, including Golden Corral corporate-owned and franchise locations.

33. For example, in North Carolina, the Governor issued an executive order declaring that COVID-19 had caused a "State of Emergency," which is defined as "an occurrence or immediate threat of severe damage, injury, or loss of life <u>or property</u>" *See* N.C. Exec. Order No. 116 (Mar. 10, 2020) (emphasis added) (citing N.C. Gen. Stat. § 166A-19.3(6) (2019)). The Order defined the "emergency area" as the entire State of North Carolina. *Id.*

34. Governor Cooper issued an executive order regarding COVID-19 to, *inter alia*, "limit access to facilities that sell food and beverage," N.C. Exec. Order No. 118 (Mar. 17, 2020), and that closed in-dining restaurants.

35. Executive Order No. 118 states that it was issued in part due to "an immediate threat of serious physical injury" due to COVID-19, and that, if an "imminent hazard" exists, the Secretary for the North Carolina Department of Health and Human Services

7

("NCDHHS") may "order the owner, lessee, operator, or other person in control of property abate the imminent hazard."

36. The NCDHHS issued an "Order of Abatement of Imminent Hazard" that classified the COVID-19 outbreak and its effects on restaurants as an "<u>imminent hazard</u>," and directed that "[a]ll owners, lessees, operators, or other persons in control of a restaurant shall close all restaurant seating areas immediately," which included "cafeterias" and "food halls". Order, NCDHHS (Mar. 17, 2020).

37. For another example, on March 27, 2020, North Carolina Governor Cooper issued Executive Order No. 121 requiring individuals to stay at home and prohibiting non-essential travel.

38. Executive Order No. 121 states that, in response to "documented 763 cases of COVID-19 across 60 counties," it was issued "to assure adequate protection of lives <u>and property</u> of North Carolinians." (Emphasis added.)

39. As another example, Mecklenburg County, North Carolina issued a "Joint Order and Declaration," effective on March 26, 2020, that "restricted access and travel upon public streets, alley, roadway or upon any other public property" in order to "protect" "property."

40. As another example, in Pennsylvania, the Governor issued an executive order "to control ingress and egress" throughout the state, declaring that COVID-19 had caused a "disaster emergency." *See* Pa. Exec. Order (Mar. 19, 2020). The "disaster emergency" is a "natural disaster," defined as a catastrophe which resulted in, *inter alia*, "<u>substantial damage to property</u>." 35 Pa. C.S. § 7102 (2019) (emphasis added).

41. Given the presence of COVID-19, ingress to and egress from Golden Corral's corporate-owned and franchise locations has also been impaired, as set forth in the Policy.

42. As a result, on or about March 20, 2020, Golden Corral was forced to suspend operations for all of its corporate-owned locations, which has resulted in substantial losses of Golden Corral's business income.

43. Golden Corral franchisees have followed suit, which has significantly reduced or eliminated the royalties paid to Golden Corral. Certain franchise locations have also had to suspend payments on their leases to Golden Corral, as well as their payments on their equipment financing to Golden Corral.

44. As a result of the above, Golden Corral's normal business operations have been interrupted, and Golden Corral has experienced and is experiencing substantial losses to revenues from its corporate-owned locations, losses of royalties from its franchise locations, and losses of rental income from leases and losses of payments from equipment financing from certain of its franchise locations, all of which are insured and covered under the Policy.

**Plaintiffs' Insurance Claims to Defendant**

45. In accordance with the terms of the Policy, on or about May 12, 2020, Plaintiffs timely notified Defendant in writing of their business interruption and insurance claims (the "Claims").

46. On or about May 13, 2020, Defendant acknowledged receipt of the notice and assigned their "Catastrophic Claim Specialist for the Pacific Region," Ms. Lisa Jones,

9

to handle Plaintiffs' Claims. Ms. Jones emailed Plaintiffs the next day requesting a time to discuss their claims.

47. Since then, Plaintiffs repeatedly reached out Defendant's Claim Specialist Ms. Jones, who failed to return phone calls and emails, or provide any response.

48. Thus, Defendant has failed to acknowledge and act reasonably promptly upon communications with respect to claims arising under the insurance policy, as set forth more fully below, in violation of Defendant's legal duties.

49. Furthermore, Plaintiffs have not received any investigatory requests from Defendant, and thus Defendant has failed to conduct any investigation of Plaintiffs' Claims (much less conduct a "reasonable investigation" of Plaintiffs' Claims) in violation of Defendant's legal duties.

50. In particular, on or about May 18, 2020, Plaintiffs emailed Ms. Jones with a time to speak, and on or about May 19, 2020, Plaintiffs attempted again to contact Ms. Jones by telephone and left Ms. Jones a message to return the call.

51. Ms. Jones did not respond to Plaintiffs.

52. On or about May 27, 2020, Plaintiffs followed up and emailed Ms. Jones again, requesting whether Ms. Jones needed to speak with Plaintiffs regarding their Claims.

53. Ms. Jones did not respond to Plaintiffs.

54. On or about June 3, 2020, Plaintiffs followed up and called Ms. Jones again, leaving her a message.

55. Ms. Jones did not respond to Plaintiffs.

56. Indeed, since the time of Plaintiffs' notice to Defendant regarding their Claims, Plaintiffs have not received any investigatory requests from Defendant regarding their Claims, nor have Plaintiffs received any explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of their Claims.

57. Though the Policy provides coverage for Plaintiffs' Claims, on or about August 10, 2020, Defendant denied coverage for Plaintiffs' Claims.

## **FIRST CLAIM FOR RELIEF -- DECLARATORY JUDGMENT**

58. Plaintiffs re-allege and incorporate all paragraphs herein by reference.

59. Under N.C. Gen. Stat. § 1-253 *et seq.*, the Court may declare rights, status, and other legal relations in order to settle and to afford relief from uncertainty and insecurity with respect thereto, whether or not further relief is or could be claimed.

60. An actual controversy exists between Plaintiffs and Defendant regarding the parties' respective rights, duties, and obligations concerning the Policy.

61. Plaintiffs contend, *inter alia*, that the Policy provides insurance coverage for Plaintiffs' insurance Claims, and that Illinois Union is required to cover the Claims.

62. In particular, Plaintiffs contend that the Policy provides business interruption coverage here under the Endorsement for "Interruption by Civil or Military Authority" during the period that civil authority orders have impaired access to their corporate-owned and franchise locations as a result of "imminent loss" due to COVID-19.

63. Plaintiffs contend that the Policy also provides business interruption coverage here under the Endorsement for "Loss of Ingress or Egress" during the period

that ingress to and egress from Golden Corral's corporate-owned and franchise locations have been impaired as a result of damage due to COVID-19.

64. Plaintiffs contend that the Policy also provides business interruption coverage here under the "Business Interruption" section for loss caused by physical loss, damage, or destruction of insured property due to COVID-19.

65. As a result of the above, Golden Corral has experienced substantial losses to revenues from its corporate-owned locations, losses of royalties from its franchise locations, and losses of rental income from leases and losses of payments from equipment financing from certain of its franchise locations, all of which Plaintiffs contend are insured and covered under the Policy.

66. Though Plaintiffs have complied with conditions precedent in the Policy and have submitted notice of their Claims, Illinois Union has denied coverage for Plaintiffs' Claims.

67. Defendant disputes that coverage is afforded under the Policy, as set forth above.

68. A declaratory judgment will resolve the above disputes and will determine the parties' respective rights, duties, and obligations in this matter, and will alleviate the parties' uncertainty regarding Defendant's liability and Plaintiffs' rights under the Policy.

69. Resolution of the duties, responsibilities, and obligations of the parties is necessary as no adequate remedy at law exists and a declaration of the Court is needed to resolve the dispute and controversy.

70. Therefore, pursuant to N.C. Gen. Stat. § 1-253 *et seq.*, Plaintiffs are entitled to a declaration that the Policy provides coverage for Plaintiffs' Claims.

## SECOND CLAIM FOR RELIEF – BREACH OF CONTRACT

71. Plaintiffs incorporate all paragraphs herein by reference.

72. Plaintiffs and Defendant are parties to the Policy described above.

73. Plaintiffs have complied with all conditions and obligations under the Policy regarding their right to coverage by Defendant for their Claims.

74. Defendant denies that it has an obligation to cover Plaintiffs' Claims, thereby breaching its obligations under the Policy and under North Carolina law.

75. Because Defendant has not provided coverage according to the Policy's terms, Plaintiffs have been forced to bear the costs of loss including, but not limited to, loss of business income and extra expense, not normally incurred with respect to their business.

76. In particular, Defendant has denied coverage for "Interruption by Civil or Military Authority" for loss of business income sustained by Plaintiffs when, as a result of "imminent loss" within five miles of an insured location, Plaintiffs' business operations were interrupted or reduced because access to Plaintiffs' business locations was impaired by order of civil authority.

77. Also, Defendant has denied coverage for "Loss of Ingress or Egress" for loss of business income sustained by Plaintiffs when, as a result of direct physical loss, damage or destruction within five miles of an insured location, Plaintiffs' business operations were interrupted or reduced because ingress or egress from Plaintiffs' business locations was impaired.

13

78. Furthermore, Defendant has denied coverage for "Business Interruption" for loss of business income resulting from the reduction of business operations caused by physical loss, damage, or destruction of property insured.

79. As a direct result of Defendant's breach of contract, Plaintiffs have been damaged in an amount greater than Seventy-Five Thousand Dollars and 00/100 ($75,000.00), to be determined at trial.

### THIRD CLAIM FOR RELIEF – BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

80. Plaintiffs incorporate all paragraphs herein by reference.

81. As set forth herein, Defendant is obligated to provide coverage for Plaintiffs' Claims under the terms of the Policy.

82. Defendant's obligations are not discretionary.

83. To the extent that Defendant argues or contends that it could exercise discretion in regard to its obligations, however, it has a duty of good faith and fair dealing not to take actions that deny Plaintiffs the ability to receive the benefits to which they are entitled under the Policy.

84. Defendant has a duty to perform its obligations under the Policy that according to reason and justice it should do in order to carry out the purpose for which the Policy was entered into.

85. Defendant has not acted reasonably, in good faith, or in a manner consistent with fair play.

86. In particular, Defendant has failed to acknowledge and act reasonably

promptly upon communications with respect to claims arising under the insurance policy.

87. Plaintiffs contacted Defendant's Claims Specialist numerous times, via telephone and email, and Defendant failed to respond.

88. Defendant did not even request or seek any investigatory information in order to investigate Plaintiffs' Claims, which insurance carriers are required to do by law.

89. Instead, without having conducted the requisite investigation, Defendant denied coverage for Plaintiffs' claims *in toto.*

90. Defendant did not provide an explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of the Claims.

91. Defendant's actions are designed to avoid coverage that is provided under the Policy for Plaintiffs' Claims.

92. Defendant's actions are injuring and interfering with Plaintiffs' rights to receive the benefits of the Policy, namely coverage for their Claims.

93. Defendant's breaches of the implied covenant of good faith and fair dealing have caused and will continue to cause damage to Plaintiffs.

94. Plaintiffs have incurred and will continue to incur cognizable damages as a result of Defendant's breaches of the implied covenant of good faith and fair dealing and are entitled to recovery of their damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court award the following relief:

1. Judgment declaring that, pursuant to the Policy, Defendant Illinois Union, as a matter of law, must provide coverage for Plaintiffs' claims as set forth herein;

2. An award of compensatory, incidental, and/or consequential damages for Plaintiffs against Defendant, in an amount to be determined at trial;

3. An award of pre- and post-judgment interest;

4. A jury trial on all issues so triable; and

5. Such other and further relief as the Court deems just and proper.

This the 28th day of August, 2020.

**MCDOUGAL WORRELL LLP**

By: */s/ Gregg E. McDougal*
Gregg E. McDougal NCSB # 27290
H. Denton Worrell, NCSB # 49750
Lawrence R. Duke, NCSB #49726
316 W. Edenton Street, Suite 100
Raleigh, North Carolina 27603
Telephone: (919) 893-9500
Facsimile: (919) 893-9510
gregg@mcdougalworrell.com
denton@mcdougalworrell.com
lawrence@mcdougalworrell.com
*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing **Amended Complaint** was filed this the 28th day of August, 2020 with the Clerk of Court using the CM/ECF system. Parties may access this filing through the Court's Electronic Filing System. Notice of this filing will be sent to the following counsel of record by operation of the Court's Electronic Filing System:

> Theodore B. Smyth
> Jennifer A. Welch
> Cranfill, Sumner & Hartzog LLP
> Post Office Box 27808
> Raleigh, NC 276111-7808

This the 28th day of August, 2020.

          **McDOUGAL WORRELL LLP**

By: */s/ Gregg E. McDougal*
     Gregg E. McDougal, NCSB # 27290
     H. Denton Worrell, NCSB # 49750
     Lawrence R. Duke, NCSB # 49726
     316 West Edenton Street, Suite 100
     Raleigh, North Carolina 27603
     Telephone: (919) 893-9500
     Facsimile: (919) 893-9510
     gregg@mcdougalworrell.com
     denton@mcdougalworrell.com
     lawrence@mcdougalworrell.com

*Attorneys for Plaintiff*