IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:20-CV-349-D

GOLDEN CORRAL CORP., and )
GOLDEN CORRAL FRANCHISING )
SYSTEMS, INC. )
)
                    Plaintiffs, )
)
          v. )                    **ORDER**
)
ILLINOIS UNION INSURANCE )
COMPANY, )
)
                    Defendant. )

On May 14, 2020, Golden Corral Corporation and Golden Corral Franchising Systems

(collectively, "Golden Corral" or "plaintiffs") filed a complaint against Illinois Union Insurance

Company ("Illinois Union" or "defendant") in Wake County Superior Court seeking to recover for

financial losses arising from the COVID-19 pandemic's effect on plaintiffs' business operations

[D.E. 1-1]. On July 2, 2020, Illinois Union removed the case to this court based on diversity

jurisdiction [D.E. 1]. On August 28, 2020, Golden Corral filed an amended complaint [D.E. 15].

On February 1, 2021, Illinois Union moved for judgment on the pleadings [D.E. 24] and filed a

memorandum in support and exhibits [D.E. 25]. On February 22, 2021, Golden Corral responded

in opposition [D.E. 31]. On March 8, 2021, Illinois Union replied [D.E. 32]. As explained below,

the court grants Illinois Union's motion for judgment on the pleadings.

I.

Golden Corral Corporation is a North Carolina corporation with a principal place of business

in Raleigh, North Carolina. See Am. Compl. [D.E. 15] ¶ 2. Golden Corral Franchising Systems is

a Delaware corporation that does business in North Carolina and has its principal place of business in Raleigh, North Carolina. See id. ¶ 3. The two entities together own or franchise approximately 483 restaurants across the United States. See id. ¶¶ 11–15. The franchisee restaurants pay royalties to Golden Corral, some have leases with Golden Corral, and some have financed equipment through Golden Corral. See id. ¶¶ 12, 14–15. Illinois Union is an insurance company organized under Illinois law, with a principal place of business in Philadelphia, Pennsylvania. See id. ¶ 4; [D.E. 17] ¶ 4. It is authorized to do business in North Carolina. See Am. Compl. ¶ 5; [D.E. 17] ¶ 5.

In March 2019, Illinois Union issued to Golden Corral a commercial property insurance policy that Golden Corral applied for, executed, and received in North Carolina. See Am. Compl. ¶ 16; [D.E. 17-1]. The policy covered the period from March 31, 2019, to March 31, 2020. See [D.E. 17-1] 27. The policy contains an "Insuring Agreement." See id. at 42. The policy insures Golden Corral against "'all risks' of direct physical loss, damage or destruction, occurring during the Policy period," except as otherwise excluded. Id. Whenever the policy uses the term "peril insured," it is referring to the Insuring Agreement plus any exclusions in the policy. See id. The policy includes numerous endorsements, including a General Amendatory Endorsement containing provisions at issue here, that affect the terms and scope of the policy. See, e.g., id. at 113–15. The policy's choice-of-law provision specifies that "[a]ny dispute concerning or related to this insurance shall be determined in accordance with the laws of the United States of America in the Jurisdiction of North Carolina, without regard to its conflict of laws principles." Id. at 40.

The COVID-19 pandemic began in early 2020 in the United States. See Am. Compl. ¶¶ 28–31. In order to address the COVID-19 pandemic, many state and local governments issued orders restricting access to restaurants, including restaurants owned or franchised by Golden Corral. See id. ¶¶ 32–35, 37–38.

2

In March 2020, Golden Corral and its franchisees suspended the operations of their restaurants in response to the government-issued orders. See id. ¶¶ 42–43. These closures disrupted Golden Corral's normal business operations, resulting in "substantial losses to revenues from its corporate-owned locations, losses of royalties from its franchise locations, and losses of rental income from leases and losses of payments from equipment financing from certain of its franchise locations." Id. ¶ 44.[1]

Golden Corral believes these financial losses are insured under its policy with Illinois Union. See id. ¶ 44. On May 12, 2020, Golden Corral filed insurance claims with Illinois Union. See id. ¶ 45. On May 13, 2020, Illinois Union acknowledged it received the claims and notified Golden Corral that it assigned the claims to the company's catastrophic claims specialist for the Pacific Region. See id. ¶ 46; [D.E. 17] ¶ 46.

On May 14, 2020, Golden Corral instituted this lawsuit in Wake County Superior Court. See [D.E. 1-1]. After suing Illinois Union, Golden Corral repeatedly attempted to contact the claims specialist about its insurance claims. See Am. Compl. ¶¶ 47–56. On August 10, 2020, Illinois Union denied Golden Corral's claims. See id. ¶ 57. On August 28, 2020, Golden Corral filed an amended complaint reflecting the denial. See [D.E. 15]. On September 11, 2020, Illinois Union answered Golden Corral's amended complaint. See [D.E. 17].

Golden Corral bases its claims on three parts of the insurance policy. First, the policy includes an endorsement for "Interruption by Civil or Military Authority." [D.E. 17-1] 113 (emphasis omitted). That endorsement states:

> This Policy insures the "Time Element" loss sustained during the period of time

_____

[1] The parties agree these financial losses exceed $75,000. See Am. Compl. ¶ 79; [D.E. 17] ¶ 79.

3

when, as a result of direct physical loss, damage or destruction or imminent loss by
a peril insured by this Policy within five (5) miles of an insured "location," normal
business operations are interrupted or reduced because access to that "location" is
prevented or impaired by order of civil or military authority.

Id.; see Am. Compl. ¶¶ 62, 76. Second, the policy includes an endorsement for "Loss of Ingress or

Egress." [D.E. 17] 113 (emphasis omitted). That endorsement states:

This Policy insures the "Time Element" loss sustained during the period when, as a
result of direct physical loss, damage or destruction by a peril insured by this Policy
within five (5) miles of an insured "location," normal business operations are
interrupted or reduced because ingress to or egress from that "location" is prevented
or impaired.

Id. at 113–14; see Am. Compl. ¶¶ 63, 77. Finally, the policy covers losses from "Business

Interruption." The coverage provision states:

This Policy insures loss resulting from the necessary interruption or reduction of
business operations conducted by the Insured and caused by physical loss, damage
or destruction, by a peril insured by this Policy, of property insured.

[D.E. 17-1] 52; see Am. Compl. ¶¶ 64, 78. In its amended complaint, Golden Corral seeks a

declaratory judgment that these provisions cover the financial losses it incurred from suspending its

business operations and seeks damages for breach of a contract. See Am. Compl. ¶¶ 58–79. Golden

Corral also seeks damages because Illinois Union allegedly breached the implied contractual

covenant of good faith and fair dealing. See id. ¶¶ 80–94.

Illinois Union denies that these policy provisions cover Golden Corral's losses and denies

it has breached any contractual obligations. See [D.E. 17] ¶¶ 70, 79, 90–94. Alternatively, Illinois

Union argues that the "Pollution, Contamination" exclusion in the policy excludes any covered

losses. See id. at 24–25. In relevant part, the exclusion states:

Loss or damages caused by, resulting from, contributed to or made worse by actual,
alleged or threatened release, discharge, escape or dispersal of 'contaminants or
pollutants,' all whether direct or indirect, proximate or remote or in whole or in part
arising from any cause whatsoever.

4

[D.E. 17-1] 60. The exclusion then defines the phrase "contaminants or pollutants" to mean:

> [A]ny material that after its release can cause or threaten damage to human health or human welfare or causes or threatens damage, deterioration, loss of value, marketability or loss of use of property insured by this Policy, including, but not limited to, bacteria, virus, or hazardous substances . . . .

Id. at 61.

On February 1, 2021, Illinois Union moved for judgment on the pleadings. See [D.E. 24]. Golden Corral opposes the motion. See [D.E. 31].

## II.

A party may move for judgment on the pleadings at any time "[a]fter the pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c). A court should grant the motion if "the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law." Park Univ. Enters., Inc. v. Am. Cas. Co. of Reading, 442 F.3d 1239, 1244 (10th Cir. 2006) (quotation omitted), abrogated on other grounds by Magnus, Inc. v. Diamond State Ins. Co., 545 F. App'x 750 (10th Cir. 2013) (unpublished); see Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc., 674 F.3d 369, 375 (4th Cir. 2012); Burbach Broad. Co. of Del. v. Elkins Radio Corp., 278 F.3d 401, 405–06 (4th Cir. 2002). A court may consider the pleadings and any materials referenced in or attached to the pleadings, which are incorporated by reference. See Fed. R. Civ. P. 10(c); Fayetteville Invs. v. Com. Builders, Inc., 936 F.2d 1462, 1465 (4th Cir. 1991). A court also may consider "matters of which a court may take judicial notice." Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 322 (2007).

The same standard applies under Rule 12(c) and Rule 12(b)(6). See Mayfield, 674 F.3d at 375; Burbach Broad. Co., 278 F.3d at 405–06. Thus, a motion under Rule 12(c) tests the legal and factual sufficiency of the claim. See, e.g., Ashcroft v. Iqbal, 556 U.S. 662, 677–80, 684 (2009); Bell

5

Atl. Corp. v. Twombly, 550 U.S. 544, 554–63 (2007); Coleman v. Md. Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010), aff'd, 566 U.S. 30 (2012); Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008). To withstand a Rule 12(c) motion, a pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Iqbal, 556 U.S. at 678 (quotation omitted); see Twombly, 550 U.S. at 570; Giarratano, 521 F.3d at 302. In considering the motion, the court must construe the facts and reasonable inferences in the "light most favorable to the [nonmoving party]." Massey v. Ojaniit, 759 F.3d 343, 347, 352–53 (4th Cir. 2014) (quotation omitted); see Clatterbuck v. City of Charlottesville, 708 F.3d 549, 557 (4th Cir. 2013), abrogated on other grounds by Reed v. Town of Gilbert, 576 U.S. 155 (2015); Burbach Broad. Co., 278 F.3d at 406. A court need not accept as true a complaint's legal conclusions, "unwarranted inferences, unreasonable conclusions, or arguments." Giarratano, 521 F.3d at 302 (quotation omitted); see Iqbal, 556 U.S. at 678–79. Rather, a plaintiff's allegations must nudge[] [its] claims," Twombly, 550 U.S. at 570, beyond the realm of "mere possibility" into "plausibility." Iqbal, 556 U.S. at 678–79.

This court has subject-matter jurisdiction based on diversity. See 28 U.S.C. § 1332. Thus, the court applies state substantive law and federal procedural rules. See Erie R.R. v. Tompkins, 304 U.S. 64, 78–80 (1938); Dixon v. Edwards, 290 F.3d 699, 710 (4th Cir. 2002).

In resolving the dispute, this court applies North Carolina substantive law. See [D.E. 17-1] 40; see also N.C. Gen. Stat. § 58-3-1; Collins & Aikman Corp. v. Hartford Accident & Indem. Co., 335 N.C. 91, 94, 436 S.E.2d 243, 245 (1993). Accordingly, this court must predict how the Supreme Court of North Carolina would rule on any disputed state law issues. See Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C., 433 F.3d 365, 369 (4th Cir. 2005). In doing so, the court must look first to opinions of the Supreme Court of North Carolina. See id.; Parkway 1046, LLC v. U.S. Home Corp., 961 F.3d 301, 306 (4th Cir. 2020); Stahle v. CTS Corp., 817 F.3d 96, 100

6

(4th Cir. 2016). If there are no governing opinions from the Supreme Court of North Carolina, this court may consider the opinions of the North Carolina Court of Appeals, treatises, and "the practices of other states." Twin City Fire Ins. Co., 433 F.3d at 369 (quotation omitted).[2] In predicting how the highest court of a state would address an issue, this court must "follow the decision of an intermediate state appellate court unless there is persuasive data that the highest court would decide differently." Toloczko, 728 F.3d at 398 (quotation omitted); see Hicks v. Feiock, 485 U.S. 624, 630 & n.3 (1988). Moreover, in predicting how the highest court of a state would address an issue, this court "should not create or expand a [s]tate's public policy." Time Warner Ent.-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp., 506 F.3d 304, 314 (4th Cir. 2007) (alteration and quotation omitted); see Day & Zimmermann, Inc. v. Challoner, 423 U.S. 3, 4 (1975) (per curiam); Wade v. Danek Med., Inc., 182 F.3d 281, 286 (4th Cir. 1999).

This action requires the court to interpret an insurance policy. In North Carolina, the "party seeking benefits under an insurance contract has the burden of showing coverage." Fortune Ins. Co. v. Owens, 351 N.C. 424, 430, 526 S.E.2d 463, 467 (2000); see Integon Nat'l Ins. Co. v. Villafranco, 228 N.C. App. 390, 393, 745 S.E.2d 922, 925 (2013). Moreover, interpreting a contract is a question of law for the court. See Briggs v. Am. & Efird Mills, Inc., 251 N.C. 642, 644, 111 S.E.2d 841, 843 (1960); N.C. Farm. Bureau Mut. Ins. Co. v. Mizell, 138 N.C. App. 530, 532, 530 S.E.2d 93, 95 (2000). When interpreting a written insurance policy:

> [T]he goal of construction is to arrive at the intent of the parties when the policy was issued. Where a policy defines a term, that definition is to be used. If no definition is given, non-technical words are to be given their meaning in ordinary speech, unless the context clearly indicates another meaning was intended. The various terms of the policy are to be harmoniously construed, and if possible, every word and every

---

[2] North Carolina has no mechanism for certifying questions of state law to the Supreme Court of North Carolina. See Town of Nags Head v. Toloczko, 728 F.3d 391, 398 (4th Cir. 2013).

Case 5:20-cv-00349-D   Document 39   Filed 09/08/21   Page 7 of 23

provision is to be given effect . . . .

Gaston Cnty. Dyeing Mach. Co. v. Northfield Ins. Co., 351 N.C. 293, 299–300, 524 S.E.2d 558, 563 (2000) (quotation omitted); see Plum Props., LCC v. N.C. Farm Bureau Mut. Ins. Co., 254 N.C. App. 741, 744–45, 802 S.E.2d 173, 175 (2017); Mizell, 138 N.C. App. at 532, 530 S.E.2d at 95. A court may only construe the policy language when the language used in the policy is ambiguous. See Mizell, 138 N.C. App. at 532, 530 S.E.2d at 95. Courts construe ambiguity against the insurer and in favor of the insured. See id., 520 S.E.2d at 95. Similarly, courts interpret coverage clauses broadly and exclusionary clauses narrowly. See Plum Props., 254 N.C. App. at 744–45, 802 S.E.2d at 175–76; Se. Airmotive Corp. v. U.S. Fire Ins. Co., 78 N.C. App. 418, 420, 337 S.E.2d 167, 169 (1985). Language is not ambiguous, however, "simply because the parties contend for differing meanings to be given to the language." Mizell, 138 N.C. App. at 532, 530 S.E.2d at 95. The court "must enforce the [policy] as the parties have made it and may not, under the guise of interpreting an ambiguous provision, remake the [policy] and impose liability upon the company which it did not assume and for which the policyholder did not pay." Wachovia Bank & Tr. Co. v. Westchester Fire Ins. Co., 276 N.C. 348, 354, 172 S.E.2d 518, 522 (1970); see Plum Props., 254 N.C. App. at 744, 802 S.E.2d at 175.

## III.

Golden Corral claims that three provisions of the insurance policy cover its losses: (1) the "Loss of Ingress or Egress" endorsement, (2) the "Business Interruption" provision, and (3) the "Interruption by Civil or Military Authority" endorsement. Illinois Union seeks judgment on the pleadings and argues that Golden Corral has failed to plausibly allege that the policy covers its financial losses. See [D.E. 25] 7–10. The court addresses the "Loss of Ingress or Egress" and "Business Interruption" provisions together given their operative language is similar, and it addresses

8

the "Interruption by Civil or Military Authority" endorsement separately because it has additional language covering "imminent loss."

## A.

Illinois Union argues the "Loss of Ingress or Egress" and "Business Interruption" provisions do not cover Golden Corral's claims. It argues that both provisions require Golden Corral to show physical loss or damage to insured property or to property within five miles of an insured location. See id. at 7–9, 18–19. Illinois Union defines "physical damage or loss" as requiring "tangible, physical damage." Id. at 8. According to Illinois Union, the presence of COVID-19 on tangible surfaces in Golden Corral's restaurants or nearby property does not meet this definition. See id. at 8–10. Illinois Union also contends that North Carolina law prohibits business-interruption insurance that does not require physical damage or loss. See id. at 10–12.

Golden Corral disagrees and contends that physical damage and loss includes situations where "the property has been rendered uninhabitable or unusable for its intended purpose." [D.E. 31] 16–22. According to Golden Corral, the presence of COVID-19 in its restaurants makes the restaurants unusable and thereby limits ingress or egress from the restaurants and interrupts Golden Corral's normal business operations. Accordingly, Golden Corral contends that these provisions cover the resulting financial losses. See id. at 16–23. Golden Corral also disagrees with Illinois Union's argument that North Carolina law requires physical, tangible damage in business-interruption provisions. See id. at 16–22.

The plain language of the "Loss of Ingress or Egress" and "Business Interruption" provisions controls. See Gaston Cnty. Dyeing Mach. Co., 351 N.C. at 299–300, 524 S.E.2d at 563; Plum Props., 254 N.C. App. at 744–45, 802 S.E.2d at 175; Mizell, 138 N.C. App. at 532, 530 S.E.2d at 95. The "Loss of Ingress or Egress" provision requires the covered loss to be "a result of direct

9

physical loss, damage or destruction by a peril insured." [D.E. 17-1] 113–14. Similarly, the "Business Interruption" provision requires the covered loss to be "resulting from the necessary interruption or reduction of business" that is "caused by physical loss, damage or destruction, by a peril insured by this Policy." Id. at 52. The only difference is that the "Loss of Ingress or Egress" provision requires direct physical loss or damage. The "peril[s] insured" are "'all risks' of direct physical loss, damage or destruction," unless otherwise excluded. Id. at 42.

When an insurance policy does not define terms, courts give the terms their ordinary, every-day meaning. See Gaston Cnty. Dyeing Mach. Co., 351 N.C. at 299–300, 524 S.E.2d at 563; Plum Props., 254 N.C. App. at 744–45, 802 S.E.2d at 175; Mizell, 138 N.C. App. at 532, 530 S.E.2d at 95. The policy does not define the words "direct," "physical," "loss," "damage," and "destruction." Cf. [D.E. 17-1] 77–82. According to the Oxford English Dictionary, "direct" means "without intermediation or intervening agency; immediate." Direct, Oxford English Dictionary (online ed.). "Physical" means "relating to natural phenomena perceived through the senses (as opposed to the mind) . . . ; tangible; concrete." Physical, Oxford English Dictionary (online ed.). "Physical" alternatively means "having a material existence," and "physical harm" means "any physical impairment." See M Consulting & Exp., LLC v. Travelers Cas. Ins. Co. of Am., 2 F. Supp. 3d 730, 736 (D. Md. 2014) (quotations and alteration omitted) (relying on Merriam-Webster Online Dictionary and Black's Law Dictionary to conclude that "inclusion of the term 'physical' clearly indicates that the damage must affect the good itself, rather than the Plaintiff's use of that good").

"Loss" means "[p]erdition, ruin, destruction; the condition or fact of being 'lost,' destroyed, or ruined." Loss, Oxford English Dictionary (online ed.). Or, similarly, it means "destruction, ruin" or "the act or fact of being unable to keep or maintain something or someone." Loss, Merriam-Webster Dictionary (online ed.). "Damage" means "injury, harm; esp[ecially] physical injury to a

10

thing, such as impairs its value or usefulness." Damage, Oxford English Dictionary (online ed.) (emphasis omitted). "Destruction" means "[t]he action of destroying; the fact or condition of being destroyed: the opposite of construction." Destruction, Oxford English Dictionary (online ed.) (emphasis omitted).

Putting the definitions together, the phrases "direct physical loss, damage or destruction" and "physical loss, damage or destruction" require tangible, physical harm or destruction to covered property or tangibly losing covered property as a result of a peril insured. See Harry's Cadillac-Pontiac-GMC Truck Co. v. Motors Ins. Corp., 126 N.C. App. 698, 702, 486 S.E.2d 249, 251–52 (1997) (interpreting a materially indistinguishable business-interruption provision to require "damage to, or destruction of, the business property" and holding that "inability to access the property" was insufficient)[3]; see also Summit Hosp. Grp., Ltd. v. Cincinnati Ins. Co., No: 5:20-CV-254-BO, 2021 WL 831013, at *3–4 (E.D.N.C. Mar. 4, 2021) (unpublished) (holding Harry's Cadillac "dictated" the "same result" in a case involving similar insurance provisions), appeal docketed, No. 21-1362 (4th Cir. Apr. 2, 2021); Bel Air Auto Auction, Inc. v. Great N. Ins. Co., No. RBD-20-2892, 2021 WL 1400891, at *7–8 (D. Md. Apr. 14, 2021), appeal docketed, No. 21-1493 (4th Cir. Apr. 29, 2021). In the "Loss of Ingress or Egress" provision, the physical harm, destruction, or loss can also be to property within five miles of an insured location that causes a loss of ingress or egress to the insured location. The "Loss of Ingress or Engress" provision also requires that harm

---

[3] Harry's Cadillac interpreted specific language within a specific insurance policy. See Harry's Cadillac, 126 N.C. App at 702, 486 S.E.2d at 252 (stating its holding as to "the language of the business interruption clause of the policy" (emphasis added)). Thus, the court rejects Illinois Union's argument that, in Harry's Cadillac, the North Carolina Court of Appeals held, as a categorical matter, that North Carolina law precludes all business-interruption provisions that cover more than physical loss or damage. See [D.E. 25] 10–12. Nevertheless, because the provisions at issue in Harry's Cadillac are materially indistinguishable to those here, Harry's Cadillac governs.

11

or loss be without any intervening factors or intermediaries (i.e., that it be direct).

The "Period of Recovery" provision, which applies to the "Business Interruption" provision, bolsters the court's reading of the "Loss of Ingress or Egress" and "Business Interruption" provisions. The "Period of Recovery" provision states:

> [The] "Time Element" as defined in 'Business Interruption,' . . . [s]hall not exceed such length of time required with the exercise of due diligence and dispatch to rebuild, repair, or replace lost, damaged or destroyed property and to make such property ready for operations under the same or equivalent physical and operating conditions that existed prior to the loss . . . .

[D.E. 17-1] 56. This provision limits the length of recovery for business interruptions to that period of time necessary to rebuild, repair, or replace damaged or lost property so that the property is restored to the "same . . . operating conditions that existed prior to the loss." Id. This language presupposes a direct, tangible alteration to property requiring repair or replacement before the property is usable again. See Summit Hosp., 2021 WL 831013, at *4 (interpreting similarly a provision for time to "rebuild, repair, or replace"). The "Period of Recovery" provision comports with a reading of the "Loss of Ingress and Egress" and "Business Interruption" clauses that requires a showing of tangible, physical loss, damage, or destruction. The court "harmoniously construe[s]" these policy provisions consistently with each other. Gaston Cnty. Dyeing Mach. Co., 351 N.C. at 299–300, 524 S.E.2d at 563; see Plum Props., 254 N.C. App. at 744–45, 802 S.E.2d at 175; Mizell, 138 N.C. App. at 532, 530 S.E.2d at 95. In contrast, adopting Golden Corral's reading would undermine the "Period of Recovery" clause and render it "ineffective, which is something the Court cannot do." Summit Hosp., 2021 WL 831013, at *4 (explaining the effect of the plaintiff's reading on a similar period-of-recovery provision).

The North Carolina Court of Appeals' decision in Great American Insurance Co. v. Mesh Café, Inc., 158 N.C. App. 312, 580 S.E.2d 431, 2003 WL 21267942 (2003) (unpublished table

12

decision), does not help Golden Corral. In Mesh Café, the relevant language covered business-interruption losses "result[ing] from direct physical loss or damage by a Covered Cause of Loss." Id. at *1 (quotation omitted and emphasis omitted). The court construed the conjunction "or" as separating "direct physical loss" from "damage by a Covered Cause of Loss," so that "damage by a Covered Cause of Loss" need not be direct or physical. See id. at *2. The insured's financial losses in that case flowed from electricity and water shut-offs after a hurricane. See id. at *1. Notably, the policy expressly enumerated damage to water and electricity supplies as covered causes of loss. See id. In contrast, the provisions at issue here do not contain an analogous "or." Moreover, because the policy does not define physical loss, damage, and destruction, there is no specific, enumerated list of covered causes to consider. Thus, the plain meaning controls. Moreover, the phrase "by a peril insured" qualifies the "physical loss, damage or destruction" language. The policy specifically defines that phrase to include all risks pertaining to direct physical loss, damage, and destruction. See [D.E. 17-1] 42. Accordingly, the policy provisions are confined to tangible, physical harms and losses.[4]

Golden Corral failed to plausibly allege tangible, physical harm to covered property or a tangible loss of covered property. And it has failed to plausibly allege such harm to or loss of property within five miles of an insured location that prevents ingress or egress to that location. At most, Golden Corral has alleged that "COVID-19 physically affects and damages all with which it comes in[to] contact." Am. Compl. ¶ 29. This contention amounts to a threadbare legal conclusion of what the policy allegedly covers. See Iqbal, 556 U.S. at 678. Moreover, Golden Corral does not

---

[4] Even if Mesh Café did conflict with this court's interpretation of the policy in this case, it is an unpublished decision. In contrast, the North Carolina Court of Appeals' decision in Harry's Cadillac is a published decision that applies to this case. Sitting in diversity, this court must follow Harry's Cadillac. See Toloczko, 728 F.3d at 398.

plausibly allege the COVID-19 virus damaged physical property in its restaurants or that Golden Corral lost any covered property due to COVID-19. Golden Corral also does not plausibly allege that physical harm to or loss of nearby property prevented ingress or egress to its insured locations. Furthermore, although virus particles may have landed on some of Golden Corral's covered property or nearby property, Golden Corral still has its property and COVID-19 has not caused the property to need rebuilding, repair, or replacement. Simply put, the virus did not change the physical condition of the property.

As for the "Business Interruption" provision specifically, Golden Corral has not plausibly alleged a time period when the property needed rebuilding, repair, or replacement. Although Golden Corral alleges it had to suspend its business operations "on or about March 20, 2020," it has not alleged when that period ended. Assuming the period is ongoing, Golden Corral has not plausibly alleged what rebuilding, repairs, or replacements were needed. In fact, Golden Corral has not alleged that its covered property even needed cleaning due to COVID-19. See [D.E. 25] 21; cf. Am. Compl. As for the "Loss of Ingress or Egress" provision, because Golden Corral has not plausibly alleged tangible physical damage to or loss of covered property or property within five miles of an insured location, any loss of ingress or egress Golden Corral has experienced at its restaurants is not "a result of" physical damage or loss.

Golden Corral has failed to plead facts showing claims covered under either the "Loss of Ingress or Egress" or "Business Interruption" provisions. Thus, the court grants Illinois Union's motion for judgment on the pleadings as to Golden Corral's claims arising under those two provisions.

**B.**

Illinois Union argues that Golden Corral has not plausibly alleged that the "Interruption by

14

Civil or Military Authority" clause covers its financial losses. In relevant part, that clause insures against a "'Time Element' loss sustained during the period of time when, as a result of direct physical loss, damage or destruction or imminent loss by a peril insured by this Policy . . . normal business operations are interrupted or reduced because access . . . is prevented or impaired by order of civil or military authority." [D.E. 17-1] 113. Golden Corral responds that because the phrase "imminent loss" is separated from the phrase "direct physical loss, damage or destruction," the court must construe it separately from the latter phrase. See [D.E. 31] 13–16.

The court agrees to construe these phrases separately. See Plum Props., 254 N.C. App. at 744–45, 802 S.E.2d at 175–76; Se. Airmotive Corp., 78 N.C. App. at 420, 337 S.E.2d at 169; see also Mesh Café, 2003 WL 21267942, at *2. However, the meaning of "direct physical loss, damage or destruction," taken separately from "imminent loss," has the same meaning as the similar language in the "Loss of Ingress or Egress" and "Business Interruption" provisions. Accordingly, Golden Corral has similarly failed to plead facts that would warrant relief under the physical-loss-and-damage clause of the "Interruption by Civil or Military Authority" provision.

As for the "imminent loss" language, the parties dispute whether Golden Corral has pleaded facts sufficient to state a claim for relief under the "imminent loss" language. Illinois Union argues that the policy qualifies "imminent loss" with the phrase "from a peril insured," and therefore "still require[s] a plausible showing of a loss caused by 'direct physical loss, damage or destruction.'" [D.E. 25] 8; see [D.E. 32] 2–3. Golden Corral disagrees, urging the court to focus on the term "imminent loss," which it contends means "harm resulting from separation or failure to utilize that may possibly occur in the future." [D.E. 31] 11. Golden Corral bolsters this argument by noting that the Insuring Agreement qualifies its definition of the perils insured with the phrase "to the extent more fully described in this Policy." Id. at 15 (quotation omitted); see [D.E. 17-1] 42. Golden

15

Corral then argues that the plain meaning of "imminent loss" more fully describes what the policy insures against. See [D.E. 31] 15.

The policy does not define the terms "imminent" or "loss." "Imminent" means "impending threateningly" or "close at hand in its incidence." Imminent, Oxford English Dictionary (online ed.). The court rejects Golden Corral's argument that "imminent loss" means a loss that "may possibly occur in the future." [D.E. 31] 11. Definitions such as "impending threateningly" and "close at hand" connote more than mere possibility. Rather, they suggest something that is near and about to happen. Moreover, as discussed, "loss" means "[p]erdition, ruin, destruction; the condition or fact of being 'lost', destroyed, or ruined." Loss, Oxford English Dictionary (online ed.). Or it can mean "destruction, ruin" or "the act or fact of being unable to keep or maintain something or someone." Loss, Merriam-Webster Dictionary (online ed.). Accordingly, the policy covers a time element during which "normal business operations are interrupted or reduced" because of an "order of civil or military authority" promulgated as a result of an impending destruction or factual inability to keep something. [D.E. 17-1] 113.

In opposition, Golden Corral emphasizes Merriam-Webster's fourth definition of "loss": a "failure to gain, win, obtain, or utilize." [D.E. 31] 11 (quotation omitted). Although Golden Corral cites and uses this definition, Golden Corral provides no persuasive argument for why the court should use this definition in this context. See Accardi v. Hartford Underwriters Ins. Co., 373 N.C. 292, 295, 838 S.E.2d 454, 457 (2020) ("[I]f the [insurance] policy fails to define a term, the court must define the term in a manner that is consistent with the context in which the term is used, and the meaning accorded to it in ordinary speech." (emphasis added)); Wachovia Bank & Tr., 276 N.C. at 354, 172 S.E.2d at 522. Using Golden Corral's definition to define "imminent loss" would require the court also to use it to define "physical loss" and "direct physical loss" because the court must

16

construe terms harmoniously. See Gaston Cnty. Dyeing Mach. Co., 351 N.C. at 299–300, 524 S.E.2d at 563; Plum Props., 254 N.C. App. at 744–45, 802 S.E.2d at 175; Mizell, 138 N.C. App. at 532, 530 S.E.2d at 95. The policy, however, lists "direct physical loss" and "physical loss" alongside "damage" and "destruction." [D.E. 17-1] 52, 113–14.[5] Generally, the principle that "associated words explain and limit each other" applies "to all written instruments." Jeffries v. Cnty. of Harnett, 259 N.C. App. 473, 493, 817 S.E.2d 36, 50 (2018) (quotations and citation omitted). Defining "loss" as a "failure to . . . utilize" does not comport with "damage" and "destruction." "Damage" indicates "injury, harm; esp[ecially] physical injury to a thing, such as impairs its value or usefulness." Damage, Oxford English Dictionary (online ed.) (emphasis omitted). And "destruction" means "[t]he action of destroying; the fact or condition of being destroyed: the opposite of construction." Destruction, Oxford English Dictionary (online ed.) (emphasis omitted). Given these definitions, this court's understanding of "loss" as "perdition, ruin, destruction" and "the act or fact of being unable to keep or maintain something" is more apt in this context than the "failure to . . . utilize" something. And to construe the policy terms harmoniously, "loss" should have the same semantic meaning in "imminent loss" as it does in "direct physical loss" and "physical loss."

Even interpreting "imminent loss" independently of the preceding phrase "direct physical loss, damage or destruction," the court cannot divorce the phrase "imminent loss" from the qualifying phrase immediately following it. That phrase specifies that covered imminent losses are those resulting from "a peril insured by this Policy." [D.E. 17-1] 113. The Insuring Agreement defines insured perils as "'all risks' of direct physical loss, damage or destruction." Id. at 42. Thus,

---

[5] Again, the "Interruption by Civil or Military Authority" and "Loss of Ingress and Egress" clauses specify "direct physical loss." The "Business Interruption" provision specifies "physical loss." [D.E. 17-1] 52, 113–14.

17

interruptions in normal business operations attributable to a civil order must be the result of imminent loss arising from a risk of direct physical loss, damage, or destruction. Stated differently, imminent loss is inextricably connected to risks of tangible, physical harm to and loss of property. Moreover, this construction does not deprive of meaning the Insuring Agreement's specification that the "all risks" language is qualified "to the extent more fully described in this Policy." Rather, "imminent loss" adds a temporal component to the "all risks" language. The language specifies a loss that is in the future but is looming and impending. This construction also does not change the requirement that the covered risk creating the future loss must be one "of direct physical loss, damage or destruction."

In contrast, adopting Golden Corral's definition of "loss" and interpreting it alongside the qualifying phrase "by a peril insured" inverts the causal chain in the "Interruption by Civil or Military Authority" provision. The provision covers a time period when (1) "normal business operations are interrupted or reduced," (2) "because access to that [insured] 'location' is prevented or impaired," (3) "by order of civil or military authority," (4) "as a result of . . . imminent loss by a peril insured by this Policy." Id. at 113. The provision contemplates that the civil order responds to the imminent loss created by a peril insured under the policy. Defining "loss" as a "failure to . . . utilize" makes little sense in this context because it is unclear how Golden Corral's inability to use its properties creates the need for a civil order restricting access. Rather, Golden Corral's inability to use its property is a consequence of the civil order. See Compl. ¶¶ 32–38.

To survive Illinois Union's motion for judgment on the pleadings, Golden Corral must have plausibly alleged that the civil orders causing its restaurant closures were responding to an impending threat of physical, tangible loss. Golden Corral must also have plausibly alleged that this impending threat of loss came from a type of risk that would create direct physical loss, damage, or

18

destruction. Golden Corral's pleadings, however, fall short. Golden Corral pleaded facts showing its normal business operations were disrupted due to orders promulgated by civil authorities. See id. But Golden Corral has not pleaded facts showing that civil authorities promulgated the orders in response to an impending threat of physical, tangible loss to covered property or property within five miles of an insured location that has disrupted Golden Corral's business operations. Accordingly, the court grants Illinois Union's motion for judgment on the pleadings as to all claims under the "Interruption by Civil or Military Authority" provision.

C.

Many courts have grappled with whether policies covering physical loss and damage cover financial losses occasioned by disruptions caused by COVID-19. "The great weight of decisions recently considering this issue in the midst of the current pandemic" have defined "physical loss" to "apply to property destroyed by some force" and "physical damage" to mean "a lesser extent of harm short of destruction or ruin." Bluegrass Oral Health Ctr., PLLC v. Cincinnati Ins. Co., No. 1:20-CV-00120-GNS, 2021 WL 1069038, at *4 (W.D. Ky. Mar. 18, 2021) (unpublished) (collecting cases); see Kingray Inc. v. Farmers Grp. Inc., No. EDCV 20-963 JGB (SPx), 2021 WL 837622, at *1–2 (C.D. Cal. Mar. 4, 2021) (collecting cases); see also [D.E. 25] 14–17 (collecting cases).

Other courts have held that language similar to the provisions here does not require physical damage so long as the property has "been rendered uninhabitable or unusable for its intended purpose." [D.E. 31] 19–22 (collecting cases); see Kingray, 2021 WL 837622, at *2–3 (collecting cases); Elegant Massage, LLC v. State Farm Mut. Auto. Ins. Co., 506 F. Supp. 3d 360, 372–76 (E.D. Va. 2020) (collecting cases).[6]

---

[6] The North Carolina Superior Court's decision in North Deli, LLC v. Cininnati Ins. Co., No. 20-CVS-02569 (N.C. Super. Ct. Oct. 9, 2020) (unpublished) [D.E. 25-1], is not binding. See King

19

After considering these divergent views, the court agrees with those courts holding that provisions requiring "direct physical loss, damage or destruction" and "physical loss, damage or destruction" require a showing of actual, tangible harm or loss. The plain meaning of these provisions supports this interpretation. Although ambiguity is construed to favor the insured, ambiguity does not arise merely because the parties disagree on the meaning. See Mizell, 138 N.C. App. at 532, 530 S.E.2d at 95. Consistent with the majority of other courts to have considered the issue, the court holds that the disputed provisions are not ambiguous.[7]

## IV.

Illinois Union argues that Golden Corral has not plausibly alleged that Illinois Union breached its implied covenant of good faith and fair dealing. See [D.E. 25] 28–29. Golden Corral did not respond to Illinois Union's arguments, except to remind the court that it alleged the claim. See [D.E. 31] 1–2.

Contracts contain in their implied terms "the basic principle of contract law that a party who enters into an enforceable contract is required to act in good faith and to make reasonable efforts to perform [its] obligations under the agreement." Maglione v. Aegis Fam. Health Ctrs., 168 N.C. App. 49, 56, 607 S.E.2d 286, 291 (2005); see Bicycle Transit Auth., Inc. v. Bell, 314 N.C. 219, 228–29, 333 S.E.2d 299, 305 (1985). Where parties have executed a written contract, an action for "breach of the covenant of good faith and fair dealing is part and parcel of a claim for breach of contract."

---

v. Ord. of United Com. Travelers of Am., 333 U.S. 153, 161 (1948); Twin City Ins. Co., 433 F.3d at 370. Moreover, North Deli is not persuasive given the Superior Court's failure to cite, much less follow, Harry's Cadillac.

[7] In light of this conclusion, the court need not resolve the parties' dispute about the "Pollution, Contamination" exclusion. Even if the court adopted Golden Corral's position on that exclusion, Illinois Union would still be entitled to judgment on the pleadings.

McKinney v. Nationstar Mortg., LLC, No. 5:15-CV-637-FL, 2016 WL 3659898, at *8 (E.D.N.C. July 1, 2016) (unpublished) (quotation and alteration omitted); see Murray v. Nationwide Mut. Ins. Co., 123 N.C. App. 1, 19, 472 S.E.2d 358, 368 (1996). Accordingly, when a court rejects a breach of contract claim, it generally rejects any claim for breach of the covenant of good faith and fair dealing contained in the contract. See Florez v. Freedom Mortg. Corp., No. 5:18-CV-22-BO, 2018 WL 3978171, at *2 (E.D.N.C. Aug. 20, 2018) (unpublished), aff'd, 776 F. App'x 185 (4th Cir. 2019) (per curiam) (unpublished); SunTrust Bank v. Bryant/Sutphin Props., LLC, 222 N.C. App. 821, 833, 732 S.E.2d 594, 603 (2012); Maglione, 168 N.C. App. at 56, 607 S.E.2d at 291.

North Carolina law recognizes a "separate claim for breach of an implied covenant of good faith and fair dealing only in limited circumstances involving special relationships between parties, [such as] cases involving contracts for funeral services and insurance." Ada Liss Grp. (2003) v. Sara Lee Corp., No. 1:06CV610, 2009 WL 3241821, at *13 n.10 (M.D.N.C. Sept. 30, 2009) (unpublished) (quotation omitted), report and recommendation adopted, 2010 WL 3910433 (M.D.N.C. Apr. 27, 2010) (unpublished). In the insurance context, a claim for breach of the covenant of good faith and fair dealing requires three elements: "1) a refusal to pay after recognition of a valid claim; 2) bad faith; and 3) aggravating or outrageous conduct." LRP Hotels of Carolina, LLC v. Westfield Ins. Co., No. 4:13-CV-94-D, 2014 WL 5581049, at *4 (E.D.N.C. Oct. 31, 2014) (unpublished) (quotations omitted); see Michael Borovsky Goldsmith LLC v. Jewelers Mut. Ins. Co., 359 F. Supp. 3d 306, 314 (E.D.N.C. 2019); Gandecha v. Metro. Prop. & Cas. Ins. Co., No. 5:13-CV-688-F, 2014 WL 4243797, at *5 (E.D.N.C. Aug. 26, 2014) (unpublished). "Bad faith means not based on honest disagreement or innocent mistake. Aggravated conduct is defined to include fraud, malice, gross negligence, insult . . . willfully, or under circumstances of rudeness or oppression, or in a manner which evinces a reckless and wanton disregard of the plaintiff's rights." Topsail Reef

21

Homeowners Ass'n v. Zurich Specialities London, Ltd., 11 F. App'x 225, 239 (4th Cir. 2001) (per curiam) (unpublished) (quotations and citation omitted); see Blis Day Spa, LLC v. Hartford Ins. Grp., 427 F. Supp. 2d 621, 631 (W.D.N.C. 2006); Michael Borovsky, 359 F. Supp. 3d at 314.

Golden Corral has failed to plausibly allege a claim for breach of the covenant of good faith and fair dealing. First, Golden Corral does not have valid breach of contract claims under this policy. Thus, although Golden Corral pleaded Illinois Union's denial of its claims, see Am. Compl. ¶ 66, it was not denial of valid claims creating a breach of contract. Accordingly, Golden Corral failed to plead facts supporting the first element. Second, Golden Corral has not plausibly alleged bad faith as a result of an illegitimate disagreement between it and Illinois Union over Golden Corral's claims. Cf. id. ¶¶ 80–94. Rather, the disagreement was both legitimate and merited. Thus, Golden Corral failed to plead the second element.

Finally, Golden Corral has not plausibly alleged aggravating or outrageous conduct. Of course, Golden Corral alleges that Illinois Union failed to communicate promptly about Golden Corral's claims, failed to seek investigatory information, and failed to provide a sufficient explanation for its denial. See id. ¶¶ 86–90. Nonetheless, accepting these allegations as true, Illinois Union's silence was not outrageous or otherwise aggravating given that Golden Corral filed this lawsuit just two days after submitting its claims to Illinois Union. See [D.E. 25] 29 n.16. As a matter of law, Illinois Union's alleged failures were not aggravating or outrageous conduct. Accordingly, the court grants Illinois Union's motion for judgment on the pleadings concerning Golden Corral's claim for breach of the implied covenant of good faith and fair dealing.

## V.

In sum, the court GRANTS Illinois Union's motion for judgment on the pleadings [D.E. 24] and DISMISSES WITH PREJUDICE Golden Corral's amended complaint [D.E. 15]. Additional

22

amendments would be futile. The court DENIES as moot defendant's motion to stay discovery [D.E. 26]. The clerk shall close the case.

SO ORDERED. This 8 day of September, 2021.

JAMES C. DEVER III
United States District Judge